IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In Re Enron Corporation Securities, Derivative & "ERISA" Litigation | § § § | MDL-1446 |
| | § | |
| MARK NEWBY, ET AL., | § § | |
| Plaintiffs | § § | |
| VS. | § § | CIVIL ACTION NO. H-01-3624 CONSOLIDATED CASES |
| ENRON CORPORATION, ET AL., | § § | |
| Defendants | § | |
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, et al., Individually and On Behalf of All Others Similarly Situated, | § § § § | |
| | § | |
| Plaintiffs, | § § | |
| VS. | § § | |
| KENNETH L. LAY, et al., | § § | |
| Defendants. | § | |
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, Individually and on behalf of all others similarly situated, | § § § § | |
| Plaintiffs, | § § | |
| VS. | § § | CIVIL ACTION NO. H-04-0087 |
| ROYAL BANK OF CANADA, ROYAL BANK HOLDING INC., ROYAL BANK DS HOLDING INC., RBC DOMINION SECURITIES INC., RBC DOMINION SECURITIES LTD., RBC HOLDINGS (USA) INC., AND RBC DOMINION SECURITIES CORP., | § § § § § § § § | |
| Defendants. | § | |

**OPINION AND ORDER**

The above referenced putative class action alleging that the Royal Bank of Canada and six of its subsidiaries and

affiliates "engaged in or participated in the implementation of manipulative or deceptive devices to inflate Enron's reported profits and financial condition and participated in a scheme to defraud or a course of business that operated as a fraud or a deceit on purchasers of Enron and Enron-related publicly traded securities between January 9, 1999 and November 27, 2001," in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("the 1934 Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5.  Complaint, #1 at 1.

    Pending before the Court are Defendants Royal Bank of Canada, Royal Bank Holding, Inc., Royal Bank DS Holding Inc., RBC Dominion Securities Limited, RBC Holdings (USA) Inc., and RBC Dominion Securities Corporation's (collectively, "RBC Defendants'")[1] motion to dismiss the complaint (instrument #16)

_____

[1] The complaint, #1 at 3-4, claims that Defendant Royal Bank Holding Inc., which is under the control of the Royal Bank of Canada,

> conducts its business affairs through a series of wholly owned and controlled subsidiaries where the bank holding company directly or indirectly owns 100% of the stock of the subsidiaries and completely directs and controls their business operations through the selection and appointment of their officers and, where necessary, directors.  These controlled subsidiaries are also the agents of the bank holding company and include subsidiaries rendering financial advice and services to public companies, including Enron. . . .  The bank holding company participated in the fraudulent scheme and course of business complained of, not only by way of the actions of the holding company itself, but also by way of the actions of numerous of its controlled subsidiaries and agents, some of which have been named as

pursuant to Fed. Rules of Civil Procedure 8, 9(b), 11, and 12(b)(6) and the Private Securities Reform Act of 1995 ("PSLRA"), codified at 15 U.S.C. § 78u-4(b)(3)(A).

The Court refers the parties to, and hereby incorporates, its memoranda and orders in *Newby*, in particular the Memorandum and Order *Re* Secondary Actors' Motions to dismiss (#1194, issued on 12/19/02), Memorandum and Order regarding Enron insiders' motions to dismiss (#1299 entered on March 25, 2003), and Memorandum and Order relating to the Imperial County Employees Retirement System's ("ICERS'") motion to intervene (#1999 entered on February 24, 2004),[2] as well as those addressing the same transactions at issue here, because the Court's prior rulings discuss in detail many of the facts alleged here and the relevant law and because the parties base some of their arguments on those decisions.

## Allegations in the Complaint

The complaint identifies the following allegedly intrinsically fraudulent transactions structured, funded, and executed by RBC Defendants for Enron from 1995-1999, which Plaintiff the Regents of the University of California contends had to provide RBC with notice of Enron's methods of systematic deception in concealing its substantial off-balance-sheet debt: (1) Caribou, commenced in 1995, utilized swap agreements with

defendants in this action.

[2] Published as *In re Enron Corp. Sec. Litig.*, 235 F. Supp. 2d 549 (S.D. Tex. 2002).

Enron affiliates that were guaranteed by Enron and created significant off-balance sheet debt exposure for Enron; (2) State Street Bank and Trust ("State Street"), a $718.8 million, five-year, securitized lease entered into around January 1996 by State Street and CXC, Inc., a securitization company serviced by Citicorp and 100% guaranteed by Enron; (3) Sarlux, a 1996 transaction involving the financing of a Sardinian power plant by means of an SPE; (4) Brazos Office Holdings L.P. ("Brazos"), an SPE, that entered into a 1997 $276 million synthetic lease with Enron to lease Enron's headquarters building and certain equipment back to an Enron affiliate, with Enron guaranteeing $213 million of that amount; (5) Bob West Treasure LLC ("Bob West"), an SPE owned by Enron and an LJM2 entity, to which RBC provided bridge financing in December 1999 and which funded the prepayment of a $105 million prepaid gas forward sales contract that was 100% guaranteed by Enron;[3] and (6) E-Next FAS 140 transaction, structured in three phases to keep $582 million in funding off Enron's balance sheet in the purchase of turbines and development of peaking power plants, but the third phase of which Enron never intended to occur, leaving Enron as a guarantor of the funds.[4]

---

[3] While claims arising out of these first five transactions would be time-barred, as the Court has concluded in other orders such a pattern of disguised loan transactions may be used as evidence of the alleged scheme to defraud investors in Enron and Enron-related securities and to establish RBC Defendants' scienter.

[4] The complaint states that Goldin determined that E-Next "was primarily a device to conceal loans to, or guarantees by, Enron." Report at 163.

Plaintiff alleges that some of these transactions were manipulative devices employed to misrepresent Enron's financial statements; others demonstrate the pattern, course of conduct, and participation by RBC in the scheme to defraud investors, in connection with Enron's purportedly misleading financial statements and Enron's intent to create them by means of deceptive structured transactions.

The complaint recites that Enron North America's ("ENA's") Court-Appointed Bankruptcy Examiner Harrison J. Goldin, in his report to the bankruptcy court regarding transactions with Enron-related special purpose entities ("SPEs") ("the Goldin Report" at 93 n.280), publicly issued on December 4, 2003,[5] reported that a factfinder could find that Caribou in 1995 (demonstrating that Enron was using prepay structure to obtain off-balance-sheet financing), State Street in 1996 (demonstrating that Enron was monetizing assets by removing them from its balance sheet), Sarlux and Brazos in 1997, Bob West in 1999, and JEDI and ECLN in 2000, constituted "red flags" putting RBC on notice that Enron had considerable exposure to off-balance-sheet debt.  Thus although the ENA Examiner did not find direct evidence of RBC's knowledge until mid-September 2000, at which time he also found that the ratings agencies were confused about the extent of that

_____

[5] A copy of the Goldin Report, entitled "Report of Harrison J. Goldin, the Court-Appointed Examiner in the Enron North American Corp. Bankruptcy Proceeding, Respecting His Investigation of the Role of Certain Entities in Transactions Pertaining to Special Purpose Vehicles," is attached to and incorporated by reference into the complaint.

exposure, Harrison did conclude that a fact-finder could infer that RBC Defendants' involvement in these earlier transactions triggered inquiry notice.

The complaint further asserts that RBC, concerned that Enron considered RBC to be a "second tier" bank, strove to become one of Enron's ten "top tier" banks, rewarded with more lucrative future business transactions and thus more fees, interest, and credit facility payments from Enron.  That ambition in part motivated RBC to participate in the fraudulent LJM2 transaction. Goldin found that in August 2000, to realize that ambition RBC hired twenty-five bankers[6] from Defendant NatWest's structured finance group.  These bankers' prior experience working with Enron purportedly gave them personal knowledge about how Enron structured off-balance-sheet transactions to make investors, analysts and rating agencies believe that Enron had current cash flow from sales of assets when, in fact, it had only "paper profits" that had not been realized.  Moreover, after these bankers were hired, RBC structured, funded and executed a number of key fraudulent transactions with Enron that constitute the heart of the current complaint, including the following:  (1) the September 2000 Alberta Prepay, a commodity prepay that was

---

[6] Among these purportedly were Gary Mulgrew, who headed NatWest's structured finance group and then Royal Bank's Global Structured Finance Group; Giles Darby, managing director of NatWest's structured finance group and Enron's "relationship manager"; and David Bermingham, a director of NatWest's structured finance group.  The complaint states that all three have been indicted for their Enron-related actions and are fugitives.

actually a disguised loan to Enron; (2) Cerberus,[7] a short-term
financing that was actually comprised of loans that allowed Enron
to monetize gains in Enron Oil & Gas shares owned by Enron; (3)
the November 2000 Hawaii 125-0 transaction, involving creation of
SPEs to purchase nonperforming assets from Enron, structured as
sales, but actually loans; (4) JEDI, for which in April 2000 RBC
was the managing agent and in a $513.5 million loan to which RBC
was a $32 million participant, and which loan RBC knew was
guaranteed by Enron common stock and an Enron swap designed to
repay the principal and interest; (5) a second, May 30, 2000 Bob
West credit swap of bridge financing to shift the risk of an Enron
or Bob West default to European Finance Reinsurance, while the
transaction retained full recourse against Enron for the off-
balance-sheet debt of Bob West; (6) Enron Credit Linked Notes
("ECLN") or Yosemite III, which RBC fraudulently funded with at
least $50 million, making RBC appear to be an equity partner in
Yosemite III, in August 2000, to hide Enron's debt from $475
million in prepay financing by Citigroup and Delta Energy.

As direct evidence of RBC's scienter, the complaint
claims that in August 2000 Enron wanted off-balance sheet
financing to allow Enron Canada to purchase an Alberta Power
Purchase Arrangement. RBC proposed three different fraudulent
transactions (described in the complaint at 12-15, ¶¶ 29-39) with
SPEs, fraudulent gas swaps, prepays and off-balance-sheet
accounting, the first two of which were rejected by Enron. In

_____

[7] At times inconsistently spelled "Cerebrus" in the pleadings.

sum, the complaint asserts, "The [final, accepted] Alberta prepay materially distorted Enron's financial statements.  Enron understated its debt and overstated its cash flow from operating activities by reporting its obligations as price risk management instead of debt."

The complaint further alleges that RBC knew by September 2000 that Enron's off-balance sheet debt might be $16 billion and quotes a comment by a RBC banker, "[B]eing Enron's auditor would be a thankless task."  Complaint at 10, ¶ 22.  RBC also learned that rating agencies were way off the mark because they did know about Caribou, Bob West, and the various disguised loans that RBC had structured, funded and executed for Enron:  Standard & Poor's calculated Enron's debt exposure as only $3 billion, while Moody's calculated it as $6.8 billion.  The complaint quotes one RBC banker's written communication to his supervisor, a vice president in risk management, after RBC's Management Group received a document relating to Enron around September 20, 2000:

> The implications of that document for Enron are absolutely enormous.  If Bob [Bob Hall, senior vice president of Risk Management group, and Piazza's supervisor ("Hall")] *read it he'd cut the [credit] limit [of Enron] in half[.] . . . If the existing off balance sheet obligations are generally stated as $6.2B . . . I suggest that asset base of the company is spurious, and that there are other obligations hidden in these vehicles[.]* . . . [T]he deal itself is a concoction that while it may "compensate a valued employee" also benefits Enron, and the equity base of the vehicles is likely inflated by partnership management fees (earned or expected?) treated as equity[.] . . . *Its [sic] hard to believe this stuff, because it implies the "10 top*

> ***tier banks" are aware of whats [sic] going on."***

Complaint at 10, ¶ 23.

A September 22, 2000 e-mail from one RBC banker to another, also quoted in the complaint, reveals that RBC knew that Enron was being pressed by the rating agencies to reduce its debt and increase its cash flow, according to Plaintiff:

> The rating agencies have been pressing Enron *vis-a-vis* low level of cash flow generation to total debt for the rating class. I think John [Aitken] is referring to the transparency of the financial statements (the integrity of the accounting principals *[sic]* behind the financial statements).

*Id.* at 11, ¶ 24.

The complaint conclusorily alleges that in September 2000, RBC knew that Andrew Fastow controlled LJM2 and that NatWest was receiving enormous profits from "equity" trades with Enron and LJM1. Even though it was worried about Fastow's conflict of interest with LJM2, RBC lent LJM2 $10 million to obtain additional business from Enron. The pleading quotes the conclusion of ENA Examiner Goldin:

> By early October, 2000, RBC knew that (i) there had been issues between Enron and its auditors for some time; (ii) Enron's auditors wanted to maintain the appearance that they were adhering to the appropriate accounting conventions; and (iii) Enron was a major global user of off-balance-sheet financing. There are also indications that RBC believed Enron's auditor's *[sic]* were not closely examining Enron's activities and that the US$800 million JEDI I refinancing RBC was looking to become involved in would not involve true equity. RBC also thought Enron would be looking to RBC "to support them over their year end."

*Id.* at 11, ¶26.  Nevertheless RBC continued to work for tier one status with Enron.  The complaint asserts that RBC's concern about Enron's liquidity, concentrating on the maximization of assets and minimization of debt on its balance sheet, led RBC to plan to reduce RBC's exposure by syndication or by underwriting more of its Enron transactions and by structuring, funding, and executing more deceptive transactions to keep Enron afloat (such as the November 7, 2000 approval by RBC's Risk Management group of RBC's participation in the Hawaii 125-0 transaction), while it simultaneously pocketed more and more fees from the troubled corporation.  RBC also reduced Enron's credit limit from $750 million (Canadian) to $500 million (Canadian) after Enron filed its 2001 10-K.

The complaint characterizes the Cerberus transaction[8] as an "invitation to co-lead a monetization of Enron's shareholding in Enron Oil and Gas ["EOG"]," in reward for RBC's participation in the Alberta Prepay and for "progress" on LJM2.  Enron wanted to "sell" the shares to generate cash to pay down other debt until the convertible bond, which the EOG shares were intended as the source to redeem, matured in June 2002.  Detailed in the complaint

---

[8] The complex Cerberus transaction is described *inter alia* in the complaint in the words of an RBC banker at 16, ¶ 43:

> The EOG shares will be transferred to the ownership of an effectively bankruptcy remote vehicle Aeneas LLC [("Aeneas")] which will issue 'A' shares (legal controlling interest but little economic value) to Enron Asset Holdings (EAH), and 'B' shares (non-voting but substantially all of the economic value).  The 'B' shares are subscribed for by Psyche LLC ("Psyche") which will then sell the 'B' shares to Heracles Share Trust [("Heracles")].  Heracles will be a trust owned by the Delaware registered entity, Wilmington Trust and the equity certificate of the trust may be assigned to Gen Re if it is part of the structure.  Heracles funds itself by way of a loan from [RBC] and will hold the 'B' interest on behalf of the lenders.  ***EAH will enter into a total return swap . . . with Heracles via which Enron receives dividends and any upside on the EOG shares and Enron pays LIBOR plus margin in return as well as any downside on EOG.  LIBOR plus margin is sufficient for Heracles to service the underlying loan to Heracles.  The obligations of EAH under the [total return swap] will be unconditionally guaranteed by Enron Corp.***

According to the ENA Examiner, "the total return swap effectively constituted a promise by EAH to pay Heracles the amounts that Heracles owed Royal Bank, to the extent the proceeds from the EOG shares actually received by Heracles were insufficient to cover the amounts owed on the loan," and thus "[t]his arrangement was equivalent to a secured guarantee of the Heracles loan."  Complaint at 16, ¶ 43.

at 15-17, ¶¶ 41-47, Cerberus gave Enron off-balance-sheet funding,
secured on its EOG shares, to raise short term (18-20 months)
funds without requiring Enron to lose control of the EOG shares;
in essence it was, according to an RBC memorandum, "a 19 month
secured 'loan' to Enron" instead of a sale of assets, as Goldin
recognized.   The complaint asserts that if the Cerberus
transaction had been accounted for in the manner that Enron
Bankruptcy Examiner Neal Batson argued was proper, the EOG shares
would have remained as assets on Enron's balance sheet and
"Enron's liability under the Original Cerberus Total Return Swap
(equal to approximately $517.5 million) would have been recorded
as debt.  Cash flow from the operating activities for *the year
2000 would have been reduced by approximately $517.5 million and
cash flow from financing activities increased correspondingly.*"
Complaint at 17, ¶ 47.

　　　　In the Hawaii 125-0 transaction in November 2000, two
special purpose trusts (Hawaii I Trust and Hawaii II Trust) were
created as one of a series of contrivances to conceal
nonperforming assets from Enron's balance sheet by selling the
assets to the trusts without Enron's "*losing control until a
legitimate third party buyer can be found*": RBC described it "*as
a warehouse vehicle for Enron allowing Enron to better time asset
sales to third parties and to aggregate assets, achieving a
critical mass for later refinancing into a longer term off-balance
sheet vehicle*."  Complaint at 18, ¶ 49.  It utilized a total
return swap, assuring lenders of payment, like an Enron guaranty,

with Enron retaining risks and benefits.  Enron's Bankruptcy
Examiner stated,

> If the Hawaii Transaction were accounted for
> in the manner the Examiner has determined to
> be proper, the assets in the Hawaii
> transactions would have remained on Enron's
> balance sheet as assets and **Enron's liability
> under the Hawaii Total Return Swaps (equal to
> approximately $43.6 million as of the
> Petition Date) would have been recorded as
> debt and the approximately $273.7 million
> gain would not have been recognized.**

Complaint at 19, ¶ 50.  RBC participated in the financing of the
Hawaii deceptive transaction, led by CIBC, which Enron's
Bankruptcy Examiner, Neal Batson, determined was fraudulent in
nature and which the Department of Justice and the SEC decided was
a sham.  Ex. 5 to #21, Enron Bankruptcy Examiner's Final Report,
Appendix. G, at 5;  Exs. 6 (SEC) and 7 (DOJ) to #21.

In August 2001 RBC, as a purported equity investor,
entered into a FAS 140 transaction with Enron involving Enron
Energy Services ("EES"), which reported as a sale of assets what
was actually a loan to Enron with no risk since Enron assured
timely and full repayment.

In December 1999 RBC provided bridge financing,
guaranteed by Enron, to Bob West Treasure for a $105 million
fraudulent gas prepay in a sale of gas to an Enron affiliate; ENA
was to pay Bob West Treasure the funds required to repay RBC's
loan to Bob West Treasure.  The Goldin Report stated that a
factfinder could determine that RBC knew under United States
accounting standards that off-balance sheet financing should not
include full recourse against Enron and thus the Bob West Treasure

loan did not qualify for off-balance sheet financing.  The report further stated that RBC knew from its review of Enron's financial condition since at least 1996 and its involvement in Caribou, State Street, and Brazos Office Holdings, that these transactions had each created substantial off-balance sheet debt for Enron and that Enron's additional exposure from the Bob West Treasure loan would be concealed from the investing public.  Moreover, the Bob West Treasure commodity swap was created to conceal the full guarantee of the RBC loan by Enron North American and Enron.

RBC was involved as managing agent in several loans to JEDI, secured by Enron common stock and utilizing a swap to create funds to repay the principal and interest, but not disclosed on Enron's financial statements, during 2000.

RBC also worked on LJM2 and in mid-November 2000 lent the partnership $10 million in order to position itself for additional lucrative transactions with Enron[9]; its LJM2 Transaction Request stated, "We also recognize that this deal is seen as **an entry ticket for more remunerative transactions which we are already seeing coming to us.**"  Complaint at 22, ¶ 59.  RBC was verbally assured that the loan would not run its full term and that RBC would be repaid within two years with a return for two years of 36.77%.  *Id.*

---

[9] RBC Defendants point out that Plaintiff does not allege that they or their employees were limited partners in LJM2 or that they were invited to invest in it.  Moreover the Goldin Report at 93-94 stated that "it was not clear that [the RBC loan] increased the off-balance sheet exposure of Enron."

In August 2000, again with risk, RBC invested at minimum $50 million in the Enron Credit Linked Notes transactions of the Yosemite III transaction, which was designed to disguise debt from $475 million in prepays by Citigroup and its controlled offshore SPE, Delta Energy.

### RBC Defendants' Motion to Dismiss

Specifically the RBC Defendants argue for dismissal in their memorandum of law in support of their motion on the grounds that (1) the claims against them are time-barred, since Plaintiff the Regents of the University of California, which also serves as Lead Plaintiff in *Newby*, had at least inquiry notice of the alleged Enron-related fraud by October 16, 2001, when Enron publicly announced one billion dollars in charges and a reduction of shareholders' equity by $1.2 billion, and when the *Newby* case, of which this suit is a part, was filed a few days later, but the Regents nevertheless failed to file this action until January 9, 2004[10]; (2) the complaint does not comply with Federal Rules of

---

[10] The initial limitations period for § 10(b)/Rule 10b-5 securities fraud claims was that established in *Lampf*, i.e., the shorter of one year after discovery of the facts constituting the violation or three years after the violation. *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 358 (1991). It was amended for all "proceedings" filed on or after the date of its enactment by the Sarbanes-Oxley Act ("Sarbanes-Oxley"), Pub. L. 107-204, § 804(b), 116 Stat. 745 (July 30, 2002), codified at 28 U.S.C. §1658. Under Sarbanes-Oxley, the limitations period for all private actions under § 10(b) and Rule 10b-5 was lengthened to two-years-from-date-of-discovery-of-facts-constituting-the-violation or five-years-from-date-of-occurrence statute of limitations. Claims that were stale when Sarbanes-Oxley was enacted were not revived by it.  # 1999 at 25-60.  Since this Court issued that decision a number of appellate courts have reached the same conclusion.  *See In re ADC Telecommunications, Inc. Sec. Litig.*, 409 F.3d 974, 977

Civil  Procedure  8(a),  9(b),  and  11  and  the  PSLRA;[11]  (3)  The

---

(8th Cir. 2005); *Foss v. Bear, Stearns & Co.*, 394 F.3d 540, 541-42
(7th Cir. 2005); *Glaser v. Enzo Biochem, Inc.*, 126 Fed. Appx. 593,
598 (4th Cir. 2004); *Enterprise Mortg. Acceptance Co., LLC, Sec.
Litig. v. Enterprise Mortg. Acceptance Co.*, 391 F.3d 401, 405-10
(2d Cir. 2004); *Chenault v. U.S. Postal Serv.*, 37 F.3d 535, 539 (9th
Cir. 1994).

    This Court previously concluded that *Newby*, filed on
October 22, 2001, is not governed by the Sarbanes-Oxley Act, but by
the *Lampf* one-year/three-year statute of limitations.

    RBC Defendants contend that this action against them is
"an integral part and an extension of the proceedings in the <u>Newby</u>
Action." They point to the order consolidating it with *Newby*, the
fact that it is subject to the pre-trial and scheduling orders and
the Deposition Protocol Order in *Newby,* the fact that Plaintiff is
Lead Plaintiff in *Newby* and calls itself "Lead Plaintiff" in this
suit, the allegations that RBC Defendants participated in a
"fraudulent scheme to misrepresent Enron's financial conditions
[as] detailed in the Regents' First Amended Consolidated Complaint
[at ¶ 3] filed May 14, 2003" in *Newby*, and the fact that the causes
of action against RBC Defendants are the same Section 10(b) and
Section 20(a) claims that are asserted against other financial
institution defendants in *Newby* that exhibited the same course of
conduct in the same or similar transactions. #17 at 9.  RBC
Defendants also highlight the fact that the Regents filed a
Consolidated Complaint in *Newby* on April 8, 2002, adding financial
institutions as defendants and alleging violations of federal
securities laws. They argue Plaintiff could and should have sued,
but chose not to sue, RBC Defendants by amending the complaint in
*Newby*.  They also point out that on December 2, 2003, the Regents
filed a separate suit against Toronto-Dominion Bank and Royal Bank
of Scotland, H-03-5528, as participants in the alleged *Newby Ponzi*
scheme.  Yet the Regents still did not sue RBC Defendants for the
same cause of action for almost another two years.

    Plaintiff responds that this action, H-04-0087, is
governed by the Sarbanes-Oxley statute of limitations because the
suit was filed after its July 30, 2002 enactment, alleges different
claims against a new financial institution that Plaintiff has sued
for the first time, and in essence is a new "proceeding" under
Sarbanes-Oxley.

---

[11] RBC Defendants argue that rather than a short, plain
statement of Plaintiff's claims, the complaint incorporates the
lengthy Goldin report in the Enron bankruptcy proceeding before the
Honorable Arthur Gonzalez.  The Goldin Report in turn incorporates
other long bankruptcy examiners' reports, including those of Enron
Examiner Neal Batson.  Not only is the complaint prolix, but it
lacks the factual specificity necessary for a securities fraud
claim.  These bankruptcy examinations were not conducted to

complaint does not differentiate among the seven RBC Defendants nor specify with particularity which wrongful acts were by which Defendant, but lumps them together, and this Court has already determined that such "group pleading" did not survive the PSLRA; (4) the complaint fails to allege that the RBC Defendants committed a primary violation of § 10(b), but at most states a claim of aiding and abetting that is not actionable after *Central Bank of Denver, N.A. v. First Interstate Bank, N.A.*, 511 U.S. 164

---

determine if there was securities fraud involving Enron and thus they lack the requisite particularity to state securities law violations. Moreover, charge RBC Defendants, the complaint is not based on Plaintiff's independent, personal investigation of the facts that form the basis of the suit, but "piggyback[s] on contested hearsay allegations by a third party," circumventing Rule 11.

The Court observes that under the PSLRA, a plaintiff need not plead from personal knowledge, but may plead based on "information and belief" as long as the plaintiff "state[s] with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). *See also ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 351 (5th Cir. 2002)(An allegation is "made on information and belief" when it is not based on personal knowledge). In *ABC Arbitrage*, 291 F.3d at 351, the Fifth Circuit adopted the standard of the Second Circuit as set forth in *Novak v. Kasaks*, 216 F.3d 300, 312-14 (2d Cir. 2000)(where complaint is based on information and belief, plaintiff "need only plead with particularity *sufficient* facts to support those beliefs"), *cert denied*, 531 U.S. 1012 (2000). In *Novak* the plaintiffs relied on confidential sources. The Second Circuit concluded that the sources need not be named and found the complaint was sufficient because it identified with particularity several documentary sources that supported their belief that serious inventory problems existed during the class period. It stated, "a complaint can meet the new pleading requirement imposed by paragraph (b)(1) by providing documentary evidence and/or sufficient general description of the personal sources of the plaintiffs' beliefs." *Id.* at 314. Here the sources (bankruptcy examiners' reports) are not confidential but were documents publicly filed in the bankruptcy court by independent examiners, required by statute to be disinterested, and the reports are attached as exhibits to pleadings in the file.

(1994),[12] and the complaint fails to plead facts giving rise to a strong inference of scienter; (5) Plaintiff fails to allege loss causation adequately under *Dura Pharmaceuticals, Inc. v. Broudo*, 125 S. Ct. 1627 (2005) because Plaintiff's damage claim is premised exclusively on the allegation that the purchase price of the securities was artificially inflated by RBC Defendants' wrongdoing; and (6) Plaintiff's claim for control person liability under § 20(a) fails because there is no properly pled, independent violation of § 10(b) by the controlled person that is not barred by limitations and because there are no specific allegations of actual control by any of the RBC Defendants over a primary violator, but only conclusory allegations. They maintain that the complaint merely alleges that RBC Defendants engaged over a seven-year period in what were private structured finance transactions[13]

---

[12] RBC Defendants argue that Goldin's report found the evidence only supported an inference that RBC aided and abetted Enron's officers in breaching their fiduciary duty to shareholders, which is insufficient to state a § 10(b) claim under *Central Bank*. Defendants do concede that Goldin found that they were aware by mid-September 2000 of the extent of Enron's off-balance-sheet accounting and that the rating agencies were confused about the amount of Enron's debt exposure, but RBC Defendants insist that Plaintiff has not shown a primary violation of the securities laws.

Plaintiff again points out that the purpose of the Examiner's report was not to find violations of federal securities law and thus its use of "aiding and abetting" language is being taken out of context. The Court agrees and, as will be discussed, even if the purpose of the report had been to find securities fraud, in bringing suit Plaintiff is not restricted to or bound by the Examiner's findings and conclusions, which were made in a different context for a different purpose.

[13] These included transactions, from 1995 on, known as Caribou, State Street, Sarlux, Brazos Holdings, Bob West Treasure, and E-Nest-1999, and Alberta, Cerberus, a refinancing of Bob West Treasure, and debt participations in Hawaii 125-0, JEDI, and LJM2. RBC Defendants point out that Goldin concluded that there was

with Enron, which were later misrepresented by Enron in its financial statements; they claim that any fraud was the result of Enron's accounting and reports, which were not created, prepared, drafted, reviewed or advised upon by RBC Defendants.  They note that Plaintiff has not and cannot allege that they have made any public false or misleading statements that affected the market for Enron securities for liability under § 10(b); nor has Plaintiff alleged that the transactions RBC Defendants have engaged in with Enron were manipulative or deceptive, but only that these transactions were misrepresented by Enron in its financial statements, for which and in which RBC Defendants insist they had no responsibility or involvement.  In addition, RBC Defendants contend that the transactions at issue were private transactions between Enron, Enron-controlled affiliates, RBC Defendants, and other financial institutions, and did not involve public disclosure or shareholder solicitation, and thus the claims against them should be dismissed.

With regard to the statute of limitations, RBC Defendants concede that the Royal Bank of Canada and the RBC

_____

an insufficient basis to find that RBC Defendants' participation in the transactions, except for the three that closed after September 2000 (i.e., the Alberta prepay, Cerberus and Hawaii), contributed to the alleged *Ponzi* scheme.  Goldin found that in Hawaii, which was structured by another financial institution, RBC was a minor debt participant.  RBC Defendants contend that there are no facts alleged demonstrating that RBC Defendants knew that Enron was improperly accounting for Alberta and Cerberus, in which RBC did participate in the structuring.  They emphasize that Arthur Andersen was a highly regarded, independent accounting firm that was reviewing such transactions and imply they were justified in relying on its work product.

Dominion Securities Corporation (collectively the "Tolled RBC Defendants") entered into separate, one-year tolling agreements[14] with Plaintiff on September 18, 2002, but emphasize that the other five ("Untolled RBC Defendants") did not.  Thus RBC Defendants argue that claims against the Untolled RBC Defendants are barred if Plaintiff discovered or should have discovered in the exercise of reasonable diligence the alleged fraud before January 9, 2003 or if the alleged fraud occurred before January 9, 2001, while Plaintiff's claims against Tolled RBC Defendants are time-barred if they were discovered or should have been discovered in the exercise of reasonable diligence prior to January 9, 2002 or if the alleged fraud occurred prior to January 9, 2000.  RBC Defendants insist that Plaintiff has admitted that it had at least inquiry notice of the facts forming the basis of the fraud claim before January 9, 2002 and thus the claims against all of them are time-barred.  They point to the following "storm warnings": Enron's shocking revelation on October 16, 2001 of $1 billion in charges and a reduction of shareholders' equity by $1.2 billion; a few days later The Wall Street Journal's expose of Enron, the SEC investigation, and Fastow's resignation; the filing of the *Newby* complaint on October 22, 2001, followed by more than fifty other lawsuits before the Consolidated Complaint was filed in *Newby* on April 8, 2002; the downgrading by 11/28/01 of Enron's publicly traded debt to "junk" status by the rating agencies;

---

[14] Copies of the Tolling Agreements, tolling limitations from September 18, 2002 until September 18, 2003, are attached as Exs. 1 and 2 to the Declaration of Claude L. Stewart III (#18).

Enron's filing for bankruptcy on December 2, 2001; and an article
in the December 24, 2001 Fortune Magazine charging that Enron's
fraud was a combination of arrogance, greed, deceit and financial
chicanery.  They further insist that Plaintiff's counsel's letter
to Royal Bank of Canada's counsel on September 18, 2002, seeking
a tolling agreement, mentioned in Plaintiff's own pleadings,
showed that it had notice of potential claims against the Bank,
which began to accrue no later than October 16, 2001, even though
Plaintiff argues that it only received notice of its claims
against RBC Defendants when the Goldin Report was released on
December 4, 2003.[15]

RBC Defendants argue that even if Plaintiff was not on
notice of the alleged fraud before January 9, 2002, the claims
against the Untolled RBC Defendants are time-barred under both
statutes of limitations because Plaintiff had actual notice of its
claims against them not later than September 18, 2002, the date
of the letter.  Alternatively, the claims are barred by the three-
year statute of repose under *Lampf*.  Plaintiff's complaint
identifies a number of transactions by the RBC Defendants that

---

[15] That letter, Ex. 3 to #18, states,

> While we believe that the Sarbanes Oxley
> legislation extends the statute of limitations
> to two years from the date of actual knowledge
> of a claim, there exists the possibility that
> a defendant could argue that the statute of
> limitations expires in mid-October of this
> year.  Thus in an abundance of caution, absent
> a tolling agreement signed by Royal Bank of
> Canada, we will have to name Royal Bank of
> Canada as a defendant on or before October 16,
> 2002.

took place from 1995 on, with only one, E-Next, taking place after January 9, 2001.  Regarding that transaction, the ENA Examiner found there was insufficient evidence to decide that Enron's accounting for the E-Next transaction was improper or that RBC aided and abetted a breach of fiduciary duty by an Enron officer.[16]

### Plaintiff's Opposition

Plaintiff argues that the extended statute of limitations of Sarbanes-Oxley applies to this action because unlike *Newby*, it was filed after enactment of the Act, and because at the time of that enactment Plaintiff's claims were not time-barred by the *Lampf* one-year statute of limitations/three-year statute of repose.  The complaint is not an amended complaint, the claims against RBC are not "substantially the same" as those against the defendants originally sued in *Newby*, but instead based on RBC Defendants' distinct conduct, Plaintiff does not rely on the *Newby* complaint even though this suit delineates RBC Defendants' purportedly illicit roles in the overall *Ponzi* scheme to defraud investors that was described in *Newby*,[17] and the Royal Bank of Canada has not previously been sued by Plaintiff for its

---

[16] Plaintiff objects to RBC Defendants' suggestion that the Goldin report absolved RBC Defendants of liability for the E-Next work.  Noting again that the report was not done to determine whether there was securities fraud, Plaintiff points out that the ENA Examiner concluded, Goldin Report at 163, that "RBC knew Enron's exposure in E-Next would not be disclosed properly on Enron's Financial Statements."

[17] Because the *Newby* complaint "provides a context for measuring specific allegations" against the RBC Defendants and for judicial efficiency to avoid reiterating many relevant facts, Plaintiff now states that it incorporates the *Newby* complaint by reference for context only.  #21 at 32.

role in the Enron fraud; thus the case is a "new proceeding" governed by Sarbanes-Oxley's two-year/five-year limitations periods.

Plaintiff insists that it first learned of RBC's participation in Enron fraud on December 4, 2003, after Goldin's Report was released, and filed this suit one month later, less than one year (*Lampf*) and less than two years (Sarbanes-Oxley) after the discovery of facts constituting the securities law violation. Because it was not on notice of its claims until December 4, 2003, Plaintiff filed suit in less than one year of discovery of the facts and the claims are not time-barred under either statute of limitations.

Moreover, Plaintiff insists it has charged RBC with primary violations. In furtherance of Enron's alleged fraudulent scheme to defraud investors, as observed by Goldin, RBC played a substantial role in creating, structuring, and implementing the financial transactions discussed *supra*, which RBC knew would fundamentally distort Enron's reported financial status.

In response to the group pleading challenge, Lead Plaintiff points out that it has pled that RBC Defendants, under the control of the  Royal Bank of Canada, not only represent themselves to the world as a unified entity, but operated as a single entity in furtherance of the alleged fraudulent scheme, making the requirement of pleading against individual participants inapplicable, and it has identified the sham transactions in which Defendants participated, if not which transactions were performed

by which RBC Defendant.   Complaint at ¶¶ 11-20.   RBC Defendants
also hold themselves out to the public as the Royal Bank of
Canada.   Plaintiff underlines the fact that Goldin also referred
to the RBC entities together.   Plaintiff points to this Court's
March 31, 2004 order (#2044 at 8-9, 13-15) relating to Credit
Suisse First Boston and its subsidiaries, and urges the Court to
follow its determinations there that the particularity rule for
pleading fraud may be relaxed where factual information is
peculiarly within the defendant's knowledge or control, that the
complexity of the alleged scheme and the thousands of affiliates
involved support eschewing hyper-technical application of the
pleading-with-particularity requirement, and that the group
pleading rule applied to individuals, i.e., officers and directors
in securities fraud cases, not to entities of a financial
organization.   For the reasons indicated in #2044, the Court finds
that under the circumstances here, Plaintiff has adequately stated
a claim against the RBC Defendants.[18]

As for scienter, Plaintiff maintains that it has
demonstrated RBC Defendants' intent to defraud by pleading facts
showing that they knew from personal involvement that Enron was
concealing the nature of transactions designed to disguise its
exposure to debt in repeated transactions since 1995, as
recognized in Goldin's Report at 93, and to manipulate its

_____

[18] The Court notes that the Fifth Circuit's discussion of its
rejection of the group pleading doctrine under the PSLRA in
*Southland Securities Corp. v. INSpire Ins. Solutions, Inc.*, 365
F.3d 353, 364-65 (5th Cir. 2004), talks about the doctrine in terms
of individual corporate officers and directors.

financial statements, and that Defendants were motivated to participate in order to become a "top tier" Enron bank to make huge fees. It points to specific findings in Goldin's Report that demonstrate the requisite scienter on the part of RBC to commit securities fraud: (1) RBC knew that Enron manipulated its financial results as evidenced by a message from one RBC banker to his supervisor in risk management, "I suggest the asset base of the company is spurious, and that there are other obligations hidden in these vehicles."–Report at 101, 158; (2) Goldin concluded, "RBC believed Enron's auditor's [*sic*] were not closely examining Enron's activities" and he found direct evidence of RBC's knowledge of Enron's accounting practices–Report at 102, 96-97; (3) Goldin found "evidence indicating that RBC knew in mid-September, 2000 that Enron had substantial exposure to off-balance sheet-debt that was not disclosed in its financial statements and that the ratings agencies were confused about the amount of such exposure."–Report at 93, n.280, and 100-01 ("RBC had information that Enron's off-balance-sheet obligations could be as much as US$16 billion" and that RBC knew that Standard & Poor's and Moody's calculated Enron's debt exposure as US$3billion and US$6.8 billion, respectively); and (4) Goldin found that RBC had "detailed knowledge about how Enron structured off-balance-sheet transactions to make it appear to investors, analysts and rating agencies that Enron had current cash flow from sales of assets, when, in fact, the profits were only on paper and had not been realized"–Report at 98.

In its brief in opposition, Plaintiff argues that to plead loss causation adequately, it need only plead that RBC's actions "touched upon" or somehow contributed to plaintiffs' damages.  The complaint has alleged that RBC falsified Enron's financial results by illicit structured financings that caused Enron's publicly traded securities to be sold at inflated prices. It also asserts that although "plaintiffs' damages were caused by an assortment of conduct that violated § 10(b)[,] Royal Bank of Canada played a significant role in that conduct, for Royal Bank of Canada was a primary participant in the fraudulent scheme that caused plaintiffs' damages."  #21 at 41.  Plaintiff states, "By acting to falsify Enron's financial results, Royal Bank of Canada caused Enron's publicly traded securities to be sold at artificially high prices.  This caused plaintiffs to be damaged." *Id.* at 44.  According to Plaintiff, that *Ponzi* scheme placed Enron on the course of destruction years before Enron had become so highly leveraged that it had to collapse, with the "final straw" perhaps being Enron's November 2001 restatement.  Thus RBC's participation in the scheme, combined with plaintiffs' reliance on the integrity of the market price for securities, satisfies the element of causation.  That the information about RBC Defendants' particular role may not have been released until long after Enron's bankruptcy does not relieve them of responsibility.

Plaintiff maintains that it has adequately asserted a control person claim under § 20(a) against Royal Bank of Canada, a bank holding company, for its control of its subsidiaries,

divisions, and affiliates, the Royal Bank of Canada entities named as defendants, based on underlying primary violations by these entities.

### Court's Decision

### Role of a Bankruptcy Examiner

Because Goldin's report is such a central part of the complaint, the Court provides some general background information about the legal significance of a bankruptcy examiner's report. Under the Bankruptcy Code, as an alternative to appointing a trustee in a Chapter 11 reorganization case, a "disinterested" bankruptcy examiner may be appointed by the Bankruptcy Court to perform two tasks in return for reasonable compensation for the examiner's services and expenses: (1) to "investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of the plan," and any other tasks ordered by the Bankruptcy Court; and (2) then to file a report or statement regarding the investigation that includes "any fact ascertained pertaining to fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor, or to a cause of action available to the estate." *See, e.g., In re Big Rivers Electric Corp. v. Schilling*, 355 F.3d 415, 422, 429 (6th Cir. 2004)(citing and quoting 11 U.S.C. § 1104(c) and § 1106(a,b)). *Big Rivers* contains an extensive discussion of the role of the Chapter 11

examiner.   The requirement that the examiner be, and remain, "disinterested" means that the examiner may "not have an interest materially adverse to the interest of the estate or of any class of creditors of equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in the debtor or an investment banker specified in subparagraph (B) or (C), or for any other reason."   *Id.* at 431, quoting 11 U.S.C. § 101(14)(E).   The examiner also owes a fiduciary duty of complete loyalty to the creditors and shareholders.   *Id.* at 434.   Although "'the benefits of his investigative efforts flow solely to the debtor and to its creditors and shareholders, . . [as a court fiduciary] he answers solely to the court.'"   *Id.* at 432, *quoting In re Baldwin United Corp.*, 46 B.R. 314, 316 (S.D. Ohio 1985).

The purpose of the examiner's investigation is to discover what assets may exist for the debtor's estate.[19]   *The Air Line Pilots Assoc., Int'l v. American National Bank and Trust Co. of Chicago (In re Ionosphere Clubs, Inc.)*, 156 B.R. 414, 432 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir. 1994).   An examiner's investigative authority under Fed. R. Bankr. P. 2004 is broader than the scope of civil discovery.   "The investigation of an examiner in bankruptcy, unlike civil discovery under Rule 26(c),

---

[19] Nevertheless, because, as noted, the statute provides that the court-appointed bankruptcy examiner is to perform an investigation and to file a report that includes "any fact ascertained pertaining to fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor, or to a cause of action available to the estate," its content may be highly relevant to securities law violations.   11 U.S.C. § 1104(c) and § 1106(a,b).

is supposed to be a 'fishing expedition,' as exploratory and groping as appears proper to the Examiner." *Id., citing In re Vantage Petroleum Corp.*, 34 B.R. 650, 651 (E.D.N.Y. 1983), *citing Sachs v. Hadden*, 173 F.3d 929, 931 (2d Cir. 1949). Pursuant to court order, he may examine any entity with knowledge of the debtor's acts, property, liabilities, and financial affairs relating to the bankruptcy proceedings or who has had a relationship with the debtor, and his examinee does not enjoy the protections usually provided by the Federal Rules of Civil Procedure. In *Baldwin,* the bankruptcy judge analogized the function of the examiner to that of a "civil grand jury" seeking to uncover areas of and appropriate targets for recovery. 46 B.R. at 317; *Ionosphere*, 156 B.R. at 432.

"Any record compiled by the examiner is not a judicial record, but simply a source of information designed for the purpose of identifying the assets of the estate for the eventual benefit of the debtor and its creditors. That some of the parties to the proceedings will assert substantive rights to the assets, once collected, does not make the identification of these assets an adjudicatory determination of 'substantive rights.'" *Ionosphere*, 156 B.R. at 432. The Examiner's findings are not binding on the Court or the parties.[20] *Baldwin*, 46 B.R. at 316;

---

[20] Generally Federal Rule of Civil Procedure 10(c) allows a party to incorporate "any written instrument which is an exhibit" to a pleading, thereby making the attached document an integral part of the pleading for all purposes. 5A Charles Alan Wright and Arthur Miller, *Federal Practice and Procedure* § 1327 at 434 (3d ed. West 2004). As has been noted, because the Examiner's report was prepared for a different purpose and its language chosen for a

*Ionosphere*, 156 B.R. at 432.  The Examiner is not an arm of the
Court, and, indeed, is appointed by the Court to assist not it,
but to assist other parties.  *Ionosphere*, 156 B.R. at 432, 433.
Until the Examiner files his report with the court or until and
unless the documents he compiles are made judicial documents in
some other way, there is no public right of access to them.  *Id.*
at 433.  Under 11 U.S.C. § 107, the Examiner's report, like other
papers, once filed with the Bankruptcy Court become public records
unless the bankruptcy judge orders the information sealed for
commercial, confidential or defamatory reasons.  *Id.*  Any
documents underlying the report, on which the report is based, if
not filed, are not part of the court record and are not subject
to public access.  *Id.*

---

particular context, e.g., aiding and abetting allegations, the
meanings of words cannot automatically be transferred, but must be
evaluated in terms of the underlying factual allegations in
determining whether Plaintiff has stated a claim for securities
violations under the 1934 Act.  *Id.* at 450 & n.19 ("The district
court . . . can independently examine the document and form its own
conclusions as to the proper construction and meaning to be given
the attached material as long as the justice seeking objectives of
the federal rules are kept in mind."), *quoting In re Rickel &
Associates, Inc.*, 272 B.R. 74, 91-92 (Bankr. D.C.N.Y. 2002)(Rule
10(c) "does not mean that the plaintiff adopts as true every
statement in the exhibit.  Instead, an appended document will be
read to evidence what it incontestably shows once one assumes that
it is what the complaint says it is (or, in the absence of a
descriptive allegation, that it is what it appears to be").).
Because Plaintiff has submitted the entire portion of Goldin's
report related to RBC Defendants, the Court can view any statement
selectively quoted or referenced in the context from which it was
drawn to protect against any misrepresentation or
misinterpretation.

**Rule 12(b)(6) Motion to Dismiss**

A motion to dismiss should be granted only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).  The court must take all well pleaded facts as true and construe them in favor of the plaintiff. *Calhoun v. Hargrove*, 312 F.3d 730, 733 (5th Cir. 2002). Therefore Defendants' disagreements with the factual allegations in the complaint are not relevant in this review.

**Statute of Limitations**

In *In re Enron Corp.Securities, Derivative & "ERISA")  Litig.*, No. MDL 1446, Civ. A. H-01-3624, 2004 WL 405886, *12 (S.D. Tex. Feb. 25, 2004), this Court concluded that the Sarbanes-Oxley statute of limitations applies to actions filed on or after July 30, 2002 "based on underlying conduct that occurred before the enactment of the Sarbanes-Oxley Act as long as such claims were not time-barred by the *Lampf* statute of limitations and/or repose controlling before July 30, 2002.  This Court agrees with Plaintiff that at this stage of the litigation it appears that the Sarbanes-Oxley's statute of limitations applies to the instant action, filed on January 9, 2004.

First, the Court finds the suit is a new "proceeding" filed after enactment of Sarbanes-Oxley, based on the alleged

wrongdoing that is not the same conduct[21] charged against other
previously sued financial institution defendants in MDL 1446, on
four, substantial, Enron-related transactions by RBC Defendants,
which are being sued for the first time by Plaintiff, and which
claims were not time-barred at the time of Sarbanes-Oxley's
enactment:  September 2000 Alberta Prepay; November 2000 Cerberus;
November 2000 Hawaii 125-0; and the 2001 E-Next.  While Plaintiff
could have included these claims in the *Newby* suit had it known
of the facts on which they are based, because it claims it did
not, because Defendants have not shown that Lead Plaintiff knew
these facts or had inquiry notice before the release of the Goldin
report, and because the suit targets distinct conduct by distinct
Defendants in an action that can stand alone, there is no mandate
that it had to be.  To require otherwise would deny plaintiffs
with viable causes of action that are not time-barred the right
to bring them and/or to burden the courts by filing prematurely
potential claims about which plaintiffs lack sufficient
information.

Relying on the ICERS intervention order (#1999), RBC
argues that this suit is an extension of *Newby* and should not be
allowed to circumvent the *Lampf* time bar by waiting to file it

---

[21] Insisting this action is merely an extension of *Newby*, RBC
Defendants object that Sarbanes-Oxley applies only to new
proceedings, not to new claims or new parties, as this Court stated
in its order (#1999 at 55) allowing ICERS to intervene in *Newby*.
This Court refused to allow Plaintiff to file a new, second suit or
a new claim or add a new party to circumvent a time bar.  *Id.* at 52
n.42.

after the enactment of the Sarbanes-Oxley Act.  This Court notes that the situation regarding ICERS is factually distinguishable from that in the instant action.  ICERS not only adopted the *Newby* complaint, but its claims were based on the **same alleged material misrepresentations and omissions by the same entities** as those of other plaintiffs in the class action, which were known by the Regents when it filed the first *Newby* complaint.  *Enron*, 2004 WL 405886 at 13.  The claims against RBC Defendants are not for public misrepresentations and omissions.  The factual allegations of specific wrongdoing against RBC Defendants, though falling under the same statute and relating to the same *Ponzi* scheme, are not identical to those asserted against other financial institution defendants in *Newby* and the claims are not time-barred.  Moreover, Plaintiff asserts that it did not learn of RBC Defendants' alleged illicit conduct until December 2003, while Lead Plaintiff knew about the alleged misrepresentations and omissions on which ICERS' claim rested when it first filed *Newby*.  Although RBC Defendants argue that this suit has been consolidated with *Newby* and is subject to the same scheduling and discovery orders, that "consolidation" is merely a pre-trial procedural mechanism to control multidistrict litigation and is not related to substantive allegations of any suit in MDL 1446.  The fact that Plaintiff here calls itself "Lead Plaintiff," since it is the same entity that serves as Lead Plaintiff in *Newby*, is not a persuasive reason to view the instant suit as part of *Newby* because it does

not appear to have followed the PSLRA's procedures to become a Lead Plaintiff in this individual class action.

The Court finds that the claims here were not time-barred under *Lampf* when Sarbanes-Oxley was enacted nor are they time barred under Sarbanes-Oxley, for the following reasons. Plaintiff has pled that it first discovered the facts regarding RBC's alleged role in the Enron matter on December 4, 2003 and filed this suit on January 9, 2004, clearly after the enactment of Sarbanes-Oxley and less than one year after the discovery of the facts leading to its claims. This Court has previously ruled that the issue of whether a plaintiff was aware of sufficient facts to put it on inquiry notice is frequently not proper for determination on a Rule 12(b)(6) motion. The Court has also found that the complexity of the alleged schemes involving Enron took substantial time to unravel, especially with respect to alleged wrongdoing by persons and entities outside of the corporation. Plaintiff insists that its September 18, 2002 letter seeking a tolling agreement and stating that "there exists the possibility that a defendant could argue that the statute of limitations expires in mid-October of this year," was insufficient to constitute inquiry notice. The Court agrees. The pleading-with-particularity requirement under the PSLRA requires that inquiry notice must be demonstrated by showing that the triggering facts relate directly to the particular alleged fraud by the particular defendant. *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 171 (2d Cir. 2005), *cert. denied*, 126 S.Ct. 421 (2005), *citing La Grasta*

*v. First Union Sec., Inc.*, 358 F.3d 840, 846 (11th Cir. 2004);
*Newman v. Warnaco Group, Inc.*, 335 F.3d 187, 193 (2d Cir.
2003)("'The triggering financial data must be such that it relates
directly to the misrepresentations and omission the Plaintiffs
later allege in their action against the defendants.'").   RBC
Defendants' cited storm warnings (such as Enron's fall 2001
announcement of reduction in shareholder's equity, its
bankruptcy, or articles generally discussing Enron but not
mentioning RBC Defendants) are too general to meet this
requirement for Plaintiff's specific claims against RBC
Defendants.[22]   Moreover, as pointed out by Plaintiff, the Fifth
Circuit has held that a statute of limitations bar is an
affirmative defense, which defendants bear the burden of pleading
and proving.  *United States v. Ret. Servs. Group*, 302 F.3d 425,
430 (5th Cir. 2002)(citing Fed. R. Civ. P. 8(c)).  Nor does the
letter, as argued by RBC Defendants, demonstrate that Lead
Plaintiff "originally intended to sue the RBC Defendants in the
*Newby* proceeding."  #25 at 7.  Thus dismissal on the pleadings
under   Rule   12(b)(6)   is   not   appropriate.

Furthermore, on July 30, 2002, the enactment date of
Sarbanes-Oxley, the three-year period of repose under *Lampf*, which
would allow a plaintiff to reach conduct back to July 20, 1999,

---

[22] *See also Livid Holdings, Ltd. v. Salomon Smith Barney, Inc.*,
416 F.3d 940, 951 (2d Cir. 2005)(Because "financial problems alone
are generally insufficient to suggest fraud . . . the filing of the
bankruptcy petition alone seems unlikely to satisfy the inquiry-
plus-due diligence standard.").

had not expired as to claims arising out of the September 2000
Alberta Prepay, November 2000 Cerberus, November 2000 Hawaii 125-0
(each of which closed after September 2000), and the E-Next
transactions.  Thus Plaintiff was not "playing games" by delaying
filing suit in order to circumvent the statute of limitations.
Nor are claims arising out of those transactions barred by the
five-year period of repose under Sarbanes-Oxley.

**Primary Violation of § 10(b) and Rule 10b-5**

RBC Defendants have argued that Plaintiff fails to
allege any relationship between RBC Defendants' actions and
Enron's securities and shareholders.  They did not issue or
underwrite Enron securities, made no statements to Enron
investors, were not involved in the accounting treatment of the
transactions in which they participated.

In #1194 at 29-39 in *Newby*, this Court discussed at
length that a primary violation of § 10(b) and Rule 10b-5 need not
be in the form of a public misrepresentation or omission.  Rule
10b-5(a) and (c) allow suit, based on conduct, against defendants
who, acting with scienter, employed a material device,
contrivance, scheme or artifice or participated in a course of
business that operated as a fraud on sellers and purchasers of
stock even if those defendants did not make a materially false or
misleading statement or omission.  *Affiliated Ute Citizens v.
United States*, 406, U.S. 128, 152-53 (1972).  *See also
Superintendent of Ins. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 11
n.7 (1971)("[I]t [is not] sound to dismiss a complaint merely

because the alleged scheme does not involve the type of fraud that
is 'usually associated with the sale or purchase of securities,
whether the artifices employed involve a garden type variety of
fraud, or present a unique form of deception."); *SEC v. Zandford*,
535 U.S. 813, 820-21 (2002)(broker's continuous series of
unauthorized sales of securities and personal retention of the
proceeds without his client's knowledge to further his fraudulent
scheme "are properly viewed as a "'course of business' that
operated as a fraud or deceit on a stockbroker's customer" in
connection with the sale of securities); *Santa Fe Industries, Inc.
v. Green*, 430 U.S. 462, 475-76 and n.15 (Section 10(b) covers
deceptive "practices" and "conduct"). Here Plaintiff alleges that
RBC Defendants actively participating in a material course of
business, comprised of a number of key transactions employing
repeated fraudulent mechanisms, all part of a larger *Ponzi* scheme,
that operated as a fraud or deceit relating to the sale or
purchase of securities; with scienter RBC Defendants purportedly
engaged in series of deceptive transactions (disguised loans), in
and central to a scheme and course of business operating to
manipulate Enron's financial statements and paint a falsely
inflated picture of Enron's financial condition to the investing
public. *Zandford*, 535 U.S. at 821 ("It is enough that the scheme
to defraud and the sale of securities coincide.").  It also
invested heavily in Enron-related entities.  Goldin's Report at
138-40 summarizes,

> RBC argues that its status as one of Enron's
> "second tier" banks is evidence that it did

not provide substantial assistance to Enron. While the ENA Examiner agrees that RBC was not one of Enron's ten top tier banks, the evidence indicates that RBC was trying to become a tier one bank . . ., that Enron began to treat RBC like a tier one bank, and that in August and September, 2000 RBC had the same information about Enron as did its top tier banks. Even before this time, RBC possessed the necessary information for it to know that Enron had substantial amounts of off-balance-sheet debt, that Enron had effectively guaranteed a substantial portion of this off-balance-sheet debt, that Enron was not disclosing its exposure to this off-balance-sheet debt in its published financial statements, and that the transactions RBC was arranging, structuring and/or funding were adding to Enron's undisclosed off-balance-sheet debt. . . . RBC . . . [engaged] in repeated transactions with Enron. . . . [M]any RBC transactions had common elements, such as the swaps that were effectively Enron Corp. guarantees in the December, 1999 Bob West Treasure loan, the April, 2000 JEDI loan, the May, 2000 Bob West Treasure credit wrap, the September, 2000 Alberta transaction, November, 2000 Hawaii transaction and the November, 2000 Cerberus transaction. . . . The evidence . . . suggests that RBC provided structures for the Alberta transaction and helped structure the Cerberus transaction . . . . RBC argues that it was only a minor debt participant in most of the relevant transactions. RBC, however, was the only lender in the December, 1999 Bob West Treasure transaction, the arranger and participant in the May, 2000 Bob West Treasure transaction, the equity participant in the August, 2000 ECLN transaction, the arranger and participant in the September 2000 Alberta transaction, and the sole lead lender in the Cerberus transaction. . . . The evidence . . . indicates that the circle of swaps utilized in Alberta effectively constituted a loan and that RBC considered the transaction a loan. . . . The evidence . . . indicates that RBC knew a great deal about the relevant accounting standards, Enron's accounting practices for off-balance-sheet financings, Enron's exposure to off-balance-sheet debt, which elements and

details Enron's auditors were likely to focus
on, and other relevant matters.

RBC Defendants urge the Court to find their role in structuring the transactions at issue was similar to that of Kirkland & Ellis, which the Court dismissed. The defendants are distinguishable:  this Court has recognized an exception to liability based on substantial conduct in the representation of clients by law firms, which are shielded by the attorney-client privilege and a lawyer's duty to zealously represent his client, unless the attorney speaks out to third-parties with the intent that the third-parties would rely on the lawyer's statements.

**Control Person Claims Under § 20(a)**

As for the control person claims, the Court finds that Plaintiff has adequately asserted a claim under § 20(a) against Royal Bank of Canada, a bank holding company, for its control of its subsidiaries, divisions, and affiliates named as defendants here, based on underlying primary violations by these entities. As this Court has recognized, the Fifth Circuit requires only that the plaintiff plead that the control person has the power to direct or cause the direction of the management and policies of the controlled person, not actual exercise of that power.

**Loss Causation under Dura Pharmaceuticals**

Plaintiff's contention that it need only plead that RBC's actions "touch upon" or somehow contributed to plaintiffs' damages to satisfy the loss causation element for a claim under § 10(b) is no longer correct under the Supreme Court's ruling in *Dura Pharmaceuticals, Inc. v. Broudo,* 125 S. Ct. 1627 (2005).

In *Dura Pharmaceuticals*, purchasers of stock in the pharmaceutical company that had submitted a new asthmatic spray device for approval from the Food and Drug Administration, alleged in a securities fraud class action suit that some of the company's managers and directors misrepresented the company expected its drug sales to be profitable and that it expected FDA approval of the spray device shortly.  On the final day of the purchase period the defendants disclosed that the earnings would be less than expected largely because of slow sales, and eight months later announced that the FDA would not approve the device.  The complaint asserted only, "'*In reliance on the integrity of the market, [the plaintiffs] . . . paid artificially inflated prices for Dura securities' and the plaintiffs suffered 'damage[s]' thereby.*"  125 S. Ct. at 1630 (emphasis in the original).

Justice Stephen Breyer, writing for a unanimous Supreme Court, reversed a Ninth Circuit ruling that a plaintiff pleading securities fraud under § 10(b) and Rule 10b-5 need only establish that the price of a security was artificially inflated on the date he purchased it to plead economic loss and loss causation under the 1934 Act.[23]  The United States Supreme Court opined that in a fraud on the market case, where a plaintiff alleges that he suffered losses because he paid an artificially inflated price for

---

[23] The Eighth Circuit had also concluded that to plead loss causation a plaintiff need only allege that defendant's fraud had artificially inflated the price of the securities purchased by the plaintiff. *Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824, 831 (8th Cir. 2003).

a security, generally "as a matter of pure logic, at the moment
that a transaction takes place, the plaintiff [who has purchased
securities at an inflated price] has suffered no loss; the
inflated purchase payment is offset by ownership of a share that
at the instant possesses equivalent value." 125 S. Ct. at 1631.
In other words, at the time the purchase of a security occurs, the
alleged inflated price, alone, logically cannot constitute
"economic loss" because the plaintiff acquires a security of
"equivalent value" and the "misrepresentation will not have led
to any loss" if the plaintiff sells the shares "quickly before the
truth begins to leak out." *Id.* Furthermore, the Supreme Court
pointed out that an implied private action for securities fraud
under the Securities Exchange Act is similar in many ways to
common-law causes of action for deceit and fraudulent
misrepresentation, which require a plaintiff to show (1) that if
he had known the truth he would not have acted as he did; (2) that
he suffered actual, substantial damage; and (3) that the
defendant's deception was the proximate cause of the plaintiff's
injuries.[24]

_____

[24] In 1995 Congress codified the loss causation element in the
PSLRA:

> In any private action arising under this
> chapter, the plaintiff shall have the burden
> of proving that the act or omission of the
> defendant alleged to violate this chapter
> caused the loss for which the plaintiff seeks
> to recover damages.

15 U.S.C. § 78u-4(b)(4).

Even when the purchaser later sells his shares at a lower price, the Supreme Court questioned any automatic assumption of a link between an inflated price and a subsequent economic loss after news of the deception is leaked:

> If the purchaser sells later after the truth makes its way into the market place, an initially inflated purchase price *might* mean a later loss. But that is far from inevitably so. When the purchaser subsequently resells such shares, even at a lower price, that lower price may reflect not the earlier misrepresentation, but changed circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other related events which, taken separately or together, account for all of that lower price. . . . Other things being equal, the longer the time between purchase and sale, the more likely that is so, *i.e.*, the more likely that other factors caused the loss.

*Id.* at 1631-32. Thus the high court addressed a narrow issue: it held that in a fraud on the market case, a plaintiff must plead, and ultimately prove, more than simply that the defendant's misrepresentation caused the stock price to be inflated; an artificial high purchase price "is not itself a relevant economic loss," but merely "touches upon" the subsequent loss of value and does not necessarily cause the plaintiff economic loss, especially in light of the "tangle of factors affecting price." *Id.* at 1634, 1632.[25]

―――――――――――――

[25] Justice Breyer noted that the Ninth Circuit's standard would not serve the public policy goals of the federal securities laws, i.e., maintenance of public confidence in the market by making available private securities fraud actions; these statutes do not aim to "provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." 125 S. Ct. at 1633. The PSLRA

Although the high court did clearly indicate more must be pled to establish loss causation than a simple allegation of inflated stock price, it avoided identifying what:  "We need not, and do not, consider other proximate cause or loss related questions." *Id.* at 1633-34.  It is notable that the Supreme Court did not affirmatively adopt Dura Pharmaceuticals' argument that a plaintiff must allege and ultimately prove that the defendant made a corrective disclosure of the fraud that was followed by a related price drop, nor did it specify what must be pled to establish that "the truth became known"; instead, the Supreme Court stated generally that a complaint must "provide defendants with notice of what the relevant economic loss might be or what the cause connections might be between that loss and the misrepresentation" (i.e., "some indication of the loss and the causal connection that the plaintiff has in mind," a subjective standard), the pleading of which "should not prove burdensome" for a plaintiff.[26]  *Id.* at 1634.  Thus besides a formal corrective

---

"makes clear Congress' intent to permit private securities fraud actions for recovery where, but only where, plaintiffs adequately allege and prove the traditional elements of causation and loss." *Id.*

[26] In *Dura Pharmaceuticals* the Supreme Court found that although the complaint alleged that the plaintiffs paid artificially inflated prices for Dura Pharmaceutical's securities, it failed to allege that the share price of the stock at issue fell substantially after the truth was disclosed.  125 S. Ct. at 1634. Instead the only allegation was that the purchase price was inflated and "the complaint nowhere else provides the defendants with notice of what the relevant economic loss might be or of what the causal connection might be between the loss and the misrepresentation concerning Dura's 'spray device.'"  *Id.*

disclosure by a defendant followed by a steep drop in the price of stock, the market may learn of possible fraud a number of sources:   e.g., from whistleblowers, analysts' questioning financial results, resignations of CFOs or auditors, announcements by the company of changes in accounting treatment going forward, newspapers and journals, etc.   *See* Alan Schulman and Nicki Mendoza, *Dura Pharm., Inc. v. Broudo–The least of All Evils*, 1505 PLI/Corp. 272, 274 (Sept. 2005).   Plaintiff's economic loss may occur as "relevant truth begins to leak out" or "after the truth makes its way into the market place," and the plaintiff need only give "some indication" of the causal link between that leaked truth and his economic loss.   125 S. Ct. at 1631, 1632, 1634. Moreover, the plaintiff's loss need not be caused exclusively by the defendant's fraud. *Id.* at 276, *citing Sosa v. Alvarez-Machain*, 124 S. Ct. 2739, 2750 (2004)("Proximate case is causation substantial enough and close enough to the harm to be recognized by the law, but a given proximate cause need not be, and frequently is not, the exclusive proximate cause of harm."); *Caremark Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 649 (7th Cir. 1997)(Loss causation "does not require . . .  that the plaintiff plead that all of its loss can be attributed to the false statement of the defendant.").

The Supreme Court, "assum[ing], at least for argument's sake, that neither the Rules nor the securities statutes impose any special further requirement in respect to the pleading of proximate causation or economic loss," appeared to suggest that

Federal Rule of Civil Procedure 8(a)(2)'s standard ("a short plain statement of the claim showing that the pleader is entitled to relief") applies to the pleading of economic loss and proximate causation and that plaintiff must merely give fair notice of his claim and the grounds on which it is based, a "simple test." *Id.* at 1634 ("We concede that ordinary pleading rules are not meant to impose a great burden upon a plaintiff. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 508, 513-15 . . . (2002). But it should not prove burdensome for a plaintiff who has suffered an economic loss to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind.").[27]  Thus, as noted *supra*, under *Dura Pharmaceuticals*, one acceptable, but not the only, way to plead proximate cause and economic loss (the difference between the price the purchaser paid and the subsequent price to which the stock dropped) in fraud on the market cases is to allege that the price a plaintiff paid for a security "fell significantly after the truth [of the material misrepresentation or omission] becomes known" and that the disclosure of the misrepresentation or omission had a  significant effect on the market price.  In sum the high court found that the plaintiffs in *Dura Pharmaceuticals* failed to state a claim because they did not provide the defendants with fair notice of their claim and the

---

[27] Not all courts agree.  *See, e.g., Joffee v. Lehman Brothers, Inc.*, No. 04 Civ. 3507 RWS,  2005 WL 1492101, *14 (S.D.N.Y. June 23, 2005), in which Judge Sweet concluded that the heightened pleading standard under Federal Rule of Civil Procedure 9(b) for common law fraud applied to the pleading of loss causation for a § 10(b), Rule 10b-5 claim.

grounds on which it rested, did not assert that Dura
Pharmaceuticals' share price dropped substantially after the
falsity of their alleged misrepresentations became known
(suggesting "that plaintiffs considered the allegation of purchase
price inflation alone sufficient"), did not identify their
relevant economic loss, and did not describe the causal connection
between their economic loss and the alleged misrepresentation.
*Id.* at 1634.

While the Supreme Court rejected the Ninth Circuit's
lenient test for economic loss and loss causation as inadequate
pleading in fraud on the market cases, it did not address, and
thus left intact, more stringent requirements that had been
established by other Circuit Courts of Appeals, including the
Second, Third, Seventh, and Eleventh.[28]   125 F.3d at 1630.   For
example, in *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir.

_____

[28] Other Circuit Courts of Appeals, like the Supreme Court have
concluded that the plaintiff must allege and prove that he suffered
an economic loss and that it was proximately caused by defendant's
fraudulent conduct; it is insufficient merely to allege the
difference between the purchase price and the true value of the
security at the time of the purchase. *See, e.g., Semerenko v.
Cedant Corp.*, 223 F.3d 165, 185 (3d Cir. 2000)("Where the value of
the security does not actually decline as a result of an alleged
misrepresentation, it cannot be said that there is in fact an
economic loss attributable to that misrepresentation.   In the
absence of a correction in the market price, the cost of the
alleged misrepresentation is still incorporated into the value of
the security and may be recovered at any time simply by reselling
the security at an inflated price."), *cert. denied*, 531 U.S. 1149
(2001); *Robbins v. Koger Properties, Inc.*, 116 F.3d 1441, 1447-48
(11th Cir. 1997)("Our decisions explicitly require proof of a causal
connection between the misrepresentation and the investment's
subsequent decline in value."); *Bastian v. Petren Res. Corp.*, 892
F.2d 680, 685 (7th Cir. 1990)(plaintiff must prove causation).

2005), *cert. denied*, 126 S.Ct. 421 (2005),[29] the Second Circuit
indicated that a plaintiff must allege that his loss was
"foreseeable" and that it was caused by the "materialization of
the concealed risk."  396 F.3d at 173.  In *Emergent Capital Inv.
Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir.
2003), the Second Circuit described loss causation in terms of the
tort-law concept of proximate cause, i.e., "that damages suffered
by plaintiff must be a foreseeable consequence of any
misrepresentation."  Stated another way, "a misstatement or
omission is the proximate cause of an investor's loss if the risk
caused by the loss was within the zone of risk *concealed* by the
misrepresentations and omissions alleged by the disappointed
investor"; thus to demonstrate loss causation the complaint must
allege "that the misstatement or omission concealed something from
the market that, when disclosed, negatively affected the value of
the security.  Otherwise the loss in question was not foreseeable
. . . "  The complaint must also assert "that the *subject* of the
fraudulent statement or omission was the cause of the actual loss
suffered."  *Lentell*, 396 F.3d at 172-73, 175.[30]  If the

_____

[29] The Court notes that *Lentell* issued on January 20, 2005,
about three months before *Dura Pharmaceuticals*, and that the
Supreme Court denied certiorari, but did not reverse it, after *Dura
Pharmaceuticals*.

[30] Thus if the complaint asserts that a broker initially rated
a stock as "buy" and subsequently downgraded it to "neutral," that
fact does not constitute a "corrective disclosure" because it does
not disclose to the market the falsity of the earlier
recommendation nor allege that the recommendation is the cause of
the decline in stock value that plaintiff's claim is their loss.
*Id.* at 175 & n.4.

relationship between the plaintiff's investment loss and the information misstated or concealed by the defendant is sufficiently direct, the element of loss causation for pleading, which requires a fact-specific inquiry at trial stage, is satisfied. *Id.* at 174. The pleading burden will vary with the circumstances. A disparity between the purchase price and the "true investment quality" at the time of purchase, by itself, is not sufficient; if there is a market-wide drop in prices, the plaintiff must plead facts that show that the plaintiff's loss was caused by the alleged misstatements and not by any intervening factor. *Id.* at 174. If there was an intervening event, like a fall in the price of gasoline stock, the issue becomes "a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss." *Id.* Thus it appears *Lentell* provides different modes of pleading for different problems.

> A district court in New York has commented,

> Where the alleged misstatement conceals a condition or event which then occurs and causes the plaintiff's loss, it is the materialization of the undisclosed condition or event that causes the loss.[31] By contrast, where the alleged misstatement is an intentionally false opinion, the market will

---

[31] As examples, the district court cites concealed incompetence that led to the corporation's collapse, and concealment of a company's intent to recapitalize that led the plaintiff to sell his stock because he was unaware that a recapitalization will greatly increase his stock's value. *Initial Public*, 2005 WL 1529659, *6 n.55.

> not respond to the truth until the falsity is
> revealed–i.e., a corrective disclosure.[32]

*In re Initial Public Offering Securities Litig. v. Credit Suisse First Boston Corp.*, No. MDL 1554(SAS), 21 MC 92 (SAS), 2005 WL 1529659, *6 (S.D.N.Y. June 28, 2005).

In the aftermath of *Dura Pharmaceuticals* two appellate courts have ruled on the pleading of loss causation and economic loss. In an unpublished opinion in a securities fraud class action suit alleging that senior Kmart officers and PricewaterhouseCoopers made misrepresentations about Kmart's financial condition before the corporation filed for bankruptcy and restated some interim financial reports, the Sixth Circuit affirmed the lower court's dismissal of the complaint for failure to plead loss causation for the same reasons as the Supreme Court, i.e., because in conclusory boilerplate language the complaint alleged only that plaintiffs paid artificially inflated prices for Kmart's securities and it "did not plead that the alleged fraud became known to the market on any particular day, did not estimate the damages that the alleged fraud caused, and did not connect the alleged fraud with the ultimate disclosure and loss." *D.E. & J.L.P. v. Conaway*, No. 02-2334, 2005 WL 1386448, *5 (6th Cir. June 10, 2005). Nor did plaintiffs allege that the bankruptcy filing disclosed the fraud behind the prior misrepresentation; "of

---

[32] The complaint must plead disclosure of the intentional *falsity* of a statement, not merely that the statement was wrong, and tie that disclosure to the economic loss. Thus "plaintiffs' failure to allege a corrective disclosure of the falsity of defendants' opinions precludes any claim that such falsity caused their losses." *Initial Public*, 2005 WL 1529659 at *6.

course, the filing of a bankruptcy petition by itself does not a security fraud allegation make." *Id.* at *6.  Thus the complaint did not give fair "notice of what the relevant economic loss might be or of what the causal connection might be between the loss and the misrepresentation." *Id.* at *6 ("Here, D.E. & J. has done nothing more than note that a stock price dropped after a bankruptcy announcement, never alleging that the market's acknowledgment of prior misrepresentations [defendants' fraud] caused that drop.").

In *In re Daou Systems, Inc.*, 411 F.3d 1006 (9th Cir. 2005), the Ninth Circuit found the pleading of loss causation adequate where the complaint alleged a steep drop in the price of the company's stock after revelation of accounting figures that showed its true financial condition.  Specifically the complaint stated that on August 13, 1998, Daou's stock was priced at $18.50 per share.  Subsequently at the beginning of August 1998, and not before, the defendants disclosed that "Daou's operating expenses and margins were deteriorating." *Id.* at 1026.  On October 28, 1998 they announced that the Company had substantially missed its projected 3Q98 earnings and would report a loss of $0.17 per share, and "'that the Company's rapidly escalating work in progress account represented over $10 million in unbilled receivables—*the direct result of prematurely recognizing revenue*.'"  According to the complaint, before August 13, 1998 the defendants did not reveal the actual figures to analysts  in order to hide the deterioration of operating earnings and margins

resulting from premature and improper recognition of revenue.  *Id.*
at 1026.  The disclosure of this practice of premature recognition
of revenue before it was earned allegedly resulted in a "dramatic
negative effect on the market, causing Daou's stock to decline to
$3.25 per share, a staggering 90% drop from the Class Period High
of $34.375 *and a $17 per share drop from early August 1998.*'"  *Id.*
Plaintiffs' purported economic loss was not their purchase of
their stock at inflated prices, but the decline in the value of
their stock directly resulting from disclosure of Dauo's true
financial condition and its earlier misrepresentations.  *Id.* at
1027.  The Ninth Circuit, taking Plaintiffs' allegations as true,
found they were adequate to provide Daou with the requisite
indication that the drop in its stock price from its August 13
1998 high of $18.50, following its disclosures beginning in August
1998, was causally related to its practice of prematurely
recognizing revenue before it was earned.  *Id.*  Plaintiffs'
economic loss was not the inflated price they paid for their stock
initially, but the decline in their stock value as a direct result
of exposure of Daou's misrepresentations following Daou's
disclosures of its true financial situation beginning in August
1998.  *Id.* at 1027.

     The Fifth Circuit has not addressed loss causation since
*Dura Pharmaceuticals* was issued, nor had it examined the question
in detail previously.[33]  Therefore this Court applies the Second

---

[33] Before the Supreme Court decision, the Fifth Circuit used
the same language as the Ninth Circuit in discussing pleading loss
causation, but it is clear from the context that the language was

Circuit's standard under *Lentell*, and, pursuant to the Supreme Court's discussion in *Dura Pharmaceuticals*, does not impose heightened or onerous pleading requirements.

Plaintiff's suit was filed on January 9, 2004, more than fifteen months before the Supreme Court issued its ruling in *Dura Pharmaceuticals* on April 19, 2005. Dismissal based on a complaint's failure to comply with a Supreme Court's subsequent ruling, without allowing the plaintiff an opportunity to cure pleading deficiencies if it can, would be unjust. Although Plaintiff has employed the language rejected by the Supreme Court, from the allegations made in this complaint and in *Newby,* which it has adopted, it is obvious from facts already pled that Plaintiff can easily and adequately plead loss causation here. Although Plaintiff's proposed class purchased Enron securities at a highly inflated price because of Enron's alleged fraudulent financial statements, both complaints make clear that key corrective disclosures in the latter part of 2001 exposing material misstatements and omissions in earlier years of Enron's financial reports caused the sharp drop in price and the

---

defined differently and required a showing of proximate cause: *Huddleston v. Herman & MacLean*, 640 F.2d 534, 549 (5th Cir. 1981)(the plaintiff must prove loss causation by demonstrating that "the untruth was in some reasonably direct, or proximate, way responsible for his loss. The causation requirement is satisfied in a Rule 10b-5 case only if the misrepresentation **touches upon** the reasons for the investment's decline in value. If the investment decision is induced by misstatements or omissions that are material and that were relied upon by the claimant, but are not the proximate reason for his pecuniary loss, recovery under the Rule is not permitted. [emphasis added by the Court]"), *aff'd in part and rev'd in part on other grounds*, 459 U.S. 375 (1983).

investors' damage.  The relatively small time gap between the five transactions at issue and Jeff Skilling's August 2001 resignation, Enron's October 2001 corrective disclosures to the world, followed by SEC's investigation, is short, just over a year, thus tightening the causation link.  The price of the stock plunged following Enron's revelation and its swift descent into bankruptcy.  The putative class's economic loss was not the disparity in the inflated purchase price and the actual quality of the investment, but the significant decline in the price of the securities with the startling revelation in the fall of 2001 of Enron's previously concealed debt obligations, financial exposure, and vulnerability to bankruptcy, which it allegedly had deliberately hidden from investors.

Dismissal for failure to state a claim is not proper "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), *quoted in Cates v. Int'l Tel. and Tel. Corp.*, 756 F.2d 1161, 1180 (5th Cir. 1985); *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005)(dismissal "is improper unless it is clear that the complaint could not be saved by any amendment").  Under Federal Rule of Civil Procedure 15, this Court has the discretion to allow amendment of a pleading in the absence of undue delay, bad faith or dilatory motive on the part of the movant, when an intervening court decision changes the law and where repleading will not be futile nor prejudice the defendant.  While some courts

have refused to grant leave to amend where there are heightened pleading requirements such as under the PSLRA because allowing such would undermine that standard,[34] the Supreme Court in *Dura Pharmaceuticals* reviewed the pleading of loss causation under Rule 8's short plain statement sufficient to provide notice of the claim to the defendant.

Accordingly, for the reasons stated above, the Court

ORDERS that RBC Defendants' motion to dismiss is DENIED. The Court further

ORDERS Plaintiff to file within twenty days a concise supplemental statement pleading the basis for its allegations of loss causation.

**SIGNED** at Houston, Texas, this 22nd day of December, 2005.

_____
MELINDA HARMON
UNITED STATES DISTRICT JUDGE

---

[34] *See, e.g., Brashears v. 1717 Capital Management*, No. Civ. A. 02-1534KAJ, 2005 WL 2585247, *2 & n.4 (D. Del. Oct. 13, 2005); *In re Bristol-Myers Squibb Sec. Litig.*, No. Civ. A. 00-1990 (SRC), 2005 WL 2007004, *10 (D.N.J. Aug. 17, 2005)("The Third Circuit has made clear, that in actions filed under the PSLRA, leave to amend should not be granted in a fashion that would frustrate the heightened pleading requirements of the statute."), *citing Cal. Public Employees' Ret. Sys. v. Chubb Corp.*, No. 03-3755, 2004 WL 3015578, *27 (3d Cir. Dec. 30, 2004).